STARR and others *vs.* CHILD and others.

Where a deed conveyed 20,100 acres of land on the west side of Genesee river, bounding it easterly "*on the bank of the river agreeable to the traverse,*" and reserving "out of the above described lands one hundred acres which is conveyed by deed to A. and is to be laid out in a square form, *as near as the traverse of the river will admit,* and the said A's mill to be the centre of the eastern boundary," the whole tract including the one hundred acre reservation is bounded by the bank of the river and not by the thread of the stream.

A reservation or exception in a deed is to be taken as part of the premises granted, and not of lands not included in the general description.

On error from the supreme court. The action was ejectment for all that part of mill seat lot number 12 in Rochester, lying between a line 50 feet distant from the westerly line of the lot and the centre of the Genesee river. It was originally tried at the Monroe circuit, in October, 1835, when a verdict was obtained for the plaintiffs. The cause was brought before the supreme court upon a bill of exceptions, and the verdict sustained. The statement of the facts appearing on the trial and the reasons of the supreme court will be found in 20 *Wend.* 149. Upon writ of error to this court the judgment of the supreme court was reversed and a *venire de novo* ordered. The reasons of the court are contained in 4 *Hill,* 369.

Upon the first trial both plaintiffs and defendants relied upon title derived from Carroll, Fitzhugh and Rochester, who it was admitted owned in 1817 a tract of one hundred acres which covered the premises. The plaintiffs there relied upon a conveyance of lot number twelve in which its boundary was described as running from the easterly bounds of *the mill yard* "about forty-five feet to the Genesee river; thence northwardly along the shore of said river" to a terminus from which it ran back to the mill lot;—and the defendants upon a conveyance of the bed of the stream.

Upon the second trial, which took place at the Monroe circuit in October, 1844, before the Hon. Nathan Dayton, circuit judge, the plaintiffs proved that in 1819 William Cobb took possession

of number twelve; that his possession extended from the mill yard about seventy feet towards the centre of the river, and that his possession was transmitted to the plaintiff who was in possession at the time of the commencement of the suit, and that the defendants claimed title to the east part thereof, and rested.

The defendants thereupon proved the deed from Rochester to Cobb, dated November 5, 1819, mentioned in the report of the former trial, (20 *Wend.* 150,) and it was admitted that the plaintiff Starr had by sundry conveyances obtained the title conveyed to Cobb by such deed, and that the shore of the Genesee river at the date thereof was at a point forty-five feet easterly from the mill yard. The defendants' counsel then introduced a deed from Oliver Phelps and Nathaniel Gorham to Ebenezer Hunt and others, bearing date November 8, 1790, conveying to them "a certain tract of land and water in the Western territory, lately ceded by the state of New-York to the commonwealth of Massachusetts, in township number one in the short range, so called, situate on the west side of the Genesee river in the county of Ontario and state of New-York, containing twenty thousand and one hundred acres, and is located and bounded as follows, viz. beginning at the south-east corner of said township at the bound which is a beech post marked south C. P. and north E. H. R. B., standing on the bank of said river; thence north eighty-seven and a half degrees west six miles two hundred and ninety-two perches and sixteen links to a beech post, marked south C. P. and north E. H. R. B.; then north two and a half degrees east, five miles two hundred and ninety-six perches, to the north-west corner bound of said township, which is an iron wood post marked and numbered; then south eighty-seven and a half degrees; then east six miles, one hundred and eighty-six perches to a white oak tree, marked and numbered 1 on the north side and 2 on the south side; H. M. on the east and west sides; *then on the bank of said river agreeably to the traverse to the first mentioned bound, reserving out of the above described land one hundred acres which is conveyed by deed to Ebenezer*

Starr *v.* Child.

*Allen, and is to be laid out in a square form as near as the traverse of the river will admit, and the said Allen's mills to be the centre of the eastern boundary.*" The habendum described the premises as " the before mentioned twenty thousand acres of land with all the streams, water privileges and appurtenances whatsoever belonging to them."

It was then admitted on the part of the plaintiffs that Phelps and Gorham had title in fee to the premises purporting to be granted by the deed to Hunt, and also had title in fee to those therein excepted and recited as having been conveyed to Ebenezer Allen before and at the time he received a title therefor; and that Allen's title to the one hundred acres was by mesne conveyances transmitted to Carroll, Fitzhugh and Rochester, who received it in 1811, and held it until August 13, 1817, when by a deed between them it was partitioned and mill seat lot number twelve was conveyed in severalty to Nathaniel Rochester. The lot was therein described with reference to a map as "being the ground lying between Buffalo street [on the north] and the last mentioned lot, number nineteen [on the south] and bounded by the Genesee river on the east."

The defendants then gave in evidence a deed from Nathaniel Rochester and wife, to the defendant Child, bearing date October 26, 1828, conveying to him " all the right, title and interest in and to the streets, alleys, mill yards, the bed of the Genesee river, and the mill race-way of them, of the parties of the first part, and also all the interest, right and title, which the parties of the first part, or either of them, have in and to the waters of the Genesee river, opposite the village of Rochester, which have not already been conveyed." The evidence was here closed, and the counsel for the defendants, insisted that the plaintiff should be nonsuited for the following reasons : 1st. He had shown no title to the premises in question; 2d. If he had shown any title to the bed of the river, it was a mere possessory one derived from Cobb, which was destroyed by the proof that Cobb entered under the deed from Rochester, of November 19th, 1819, which expressly limited him to the shore; 3d. Defendant Child had produced a good paper title to

the premises. The circuit judge decided that although the plaintiff had in the first instance shown a sufficient possession to entitle him to recover, as against a mere wrong doer, yet, the paper title shown in the defendant Child, must prevail. The plaintiff excepted to the decision, and submitted to a nonsuit.

Upon the case coming again before the supreme court upon the bill of exceptions, it sustained the ruling of the circuit judge and the following opinion was delivered by

NELSON, Ch. J. It has already been settled in this court by the highest authority, that the deed from Rochester to Cobb in 1819, under whom the plaintiffs hold, did not carry mill lot number twelve, the premises conveyed, to the thread of the river. (4 *Hill*, 369.) They have failed, therefore, to make out a paper title to any portion of the bed of the river, or premises in question. They now deny that the defendants have established any paper title according to the law as expounded by the court above when the case was there, and claim still to sustain a recovery, notwithstanding that decision upon the force of their possession alone. The deed from Rochester to Cobb bounded the grantee *along the shore of the river*, which according to the decision above, excluded the bed, and limited the boundary to low water mark. But it was finally conceded in the opinions delivered affirming this view of the law, that a boundary upon a river in general terms, or by or along a river, without restriction to the bank or shore, carried with it the bed to the thread of the stream. (4 *Hill*, 373, 375, 380, 381.) Now the defendants' title turns upon the construction of the deed of the one hundred acres from Phelps and Gorham to Ebenezer Allen, prior to the deed of the 20,000 acres, subsequently conveyed to Hunt and others. This latter conveyance is referred to as material, for the purpose of showing title in the defendant, to the premises in question, which is a part of the one hundred acres. The description begins at a beech post, standing on the bank of the river, and after running round three sides, " then on the bank of the river agreeably to the traverse, to the first mentioned bounds," "*reserving out of the*

Starr *v.* Child.

*above described land, one hundred acres, which is conveyed by deed to Ebenezer Allen, and is to be laid out in a square form, as near as the traverse of the river will admit ;* and the said Allen's mill, to be the centre of the eastern boundary."

I freely admit, that there would be great difficulty, in taking the river boundary of the 20,000 acre tract, out of the doctrine as expounded by the learned judges when the case was before the court above, as the description seems to be down the boundary to the bank of the river, which they held excludes the bed. But I do not think it necessary, for the decision of this case, to undertake the task, as the premises in question, are a part of the one hundred acres which the grantors (P. & G.) had previously conveyed to Allen, and the decision here must be governed by the river boundary as given in that deed. Both plaintiffs and defendants hold under that, according to the boundaries given in the reservation or exception. Both rely upon it as evidence of the grant to Allen in deducing their paper title, and of course must abide by *the terms of the grant as* there described. These bound the one hundred acres on the river generally, "to be laid out in a square form, as near as the traverse of the river will admit," without restriction or particular reference to the bank or shore; and therefore carry with it the bed to the centre of the stream, according to all the cases, and especially the decision in the court above, already referred to ; and it is conceded in the case, that Phelps & Gorham had title to the one hundred acres, and of course a right to convey agreeably to the admission in their reservation.

I may add that a like construction has already been given by us to this deed, as thus described in the reservation, in the case of *Jackson, ex. dem. Smedley and others,* v. *Smith,* decided May 7, 1832, not reported. I have before me the manuscript opinion of the late chief justice, delivered in that case. (*a*)

(*a*) The following is the opinion referred to :

*Jackson, ex. dem. Smedley and others,* v. *Smith. By the Court,* SAVAGE, Ch. **J.** The first question in this case, is whether the deed from Phelps & Gorham to Hunt and others, conveys the land to the middle of the Genesee river. The boundaries begin at a beech post, standing on the bank of the said river, and run

We should feel bound by this decision alone, unless satisfied, that the doctrine in respect to the particular point in question, had been overruled by the appellate court, which upon our view has not been. I am of opinion, therefore, that a new trial should be denied.

*O. Hastings*, for plaintiffs in error, insisted, 1st. That the deeds from Phelps & Gorham to Hunt and others of November 8, 1790, limited the premises granted to the bank of the Genesee river, and excluded the premises in question; 2d. The defendants showed no title to any land not embraced in that

---

around three sides of the tract, terminating the third line at a white oak tree, marked and numbered, " then on the bank of the said river, agreeable to the traverse, to the first mentioned bound, reserving out of the above described land, one hundred acres, which is conveyed by deed to Ebenezer Allen, and is to be laid out in a square form as near as the traverse of the river will admit, and the said Allen's mill, to be the centre of the eastern boundary." It is well settled by the case *Ex parte Jennings*, and the cases referred to in the reporter's note to that case, (6 *Cowen*, 518, 546,) that when a stream not navigable, in the common law sense of that term, forms the boundary, the true line is the middle of the stream. The expression here, is " on the bank of the said river, agreeable to the traverse." This is equivalent to saying " along the bank," which I apprehend would leave no doubt that the stream formed the boundary. If therefore the question was upon the construction of the deed from Phelps & Gorham to Hunt, it is very certain, according to the common law doctrine, which is the law of the state, that a deed bounded upon a stream, or upon the bank of a stream, where the tide neither ebbs nor flows, conveys the land to the middle of the stream. This deed, therefore, would cover the premises in question and the lessors must fail. But the premises in question lie opposite to the Allen lot, which is excepted from the conveyance to Hunt. By that exception the Allen lot was to be laid out in a square form, as near as the traverse of the river will admit, and the said Allen's mill to be the centre of the eastern boundary. This lot the surveyor located, not by running a line through the mill, which stood several rods from the river, but by giving an equal distance north and south of the mill, and extending the lot to the margin of the water, as was the evident intention of the grantors, as well from the nature of the subject, as from the reference to the traverse of the river. If a straight line had been intended, running through the mill, that would have no reference to the traverse of the river; and as the lot was a mill lot, the parties could not have intended to separate it from the water without which the mill was of no value. This mill lot had been conveyed to Allen, before the conveyance to Hunt, and conveyed to the river, of course there was no estate remaining in the representatives of Phelps & Gorham.

deed. The reservation of the one hundred acres previously conveyed to Allen, must be construed an exception, and must be taken out of the premises previously described in the deed. (*Cruise's Dig. tit.* 32, *ch.* 20, § 65.) 3d. The deed from Phelps Gorham must receive a similar construction to the one given by this court to the deed from Rochester to Cobb, when it was examined in 4 Hill, 369.

*E. Darwin Smith,* for the defendants in error. 1. The plaintiffs showed no title. Their possession was only good against a wrongdoer who is one who claims no right. The defendants were not wrongdoers. Child claimed under a paper title. 2. The plaintiffs' right by mere possession, was destroyed by proof that their grantor entered under deeds which did not include the premises. Their grantor's deed limited him to the shore, according to the construction of this court. Possession as evidence of title, is superseded by the paper title itself. 3. The defendant Child showed a good paper title. The deed from Phelps & Gorham to Allen, is proved by the admissions in the deed to Hunt and others. Allen's grantees do not claim under the deed to Hunt, but by the original deed to Allen, admitted in Hunt's deed to exist; and the eastern boundary of Allen's lot, was the Genesee river generally, which carried it to the centre of the river. 4. The plaintiff Starr, a grantee of Carroll, Fitzhugh and Rochester, is estopped from disputing their title.

THE CHANCELLOR. When this case was formerly before the court, the plaintiffs sought to recover by virtue of a title supposed to have been derived under a deed from N. Rochester to W. Cobb, for mill lot No. 12. And for the purposes of the trial which then took place, it was admitted by both parties, that the premises in controversy, a part of the alveus or bed of the stream of the Genesee river adjacent to mill lot No. 12, belonged to Carroll, Fitzhugh and Rochester, in August, 1817. The deed to Cobb described the easterly boundary line of the lot as running *along the shore* of the Genesee river; and the plaintiffs claimed that such a boundary carried them to the middle of the

stream. The circuit judge so decided; and that decision was sustained by a majority of the then members of the supreme court; Mr. Justice Bronson dissenting. The defendants brought a writ of error to this court, and obtained a reversal of the judgment, and a *venire de novo* was awarded. (*See* 20 *Wend. Rep.* 149; 4 *Hill's Rep.* 369.) Upon the second trial, the prior title of Carroll, Fitzhugh and Rochester to the premises in question, was not admitted; but the plaintiffs claimed the right to recover by virtue of a prior possession of the premises by Cobb; which possession was transferred to Starr, one of the plaintiffs, before the defendants took possession thereof. And by virtue of that previous possession, which was proved upon the trial, the plaintiffs are entitled to recover, unless the defendants have been able to show a better title.

The fact that Cobb went into possession of the premises in controversy, under the supposition that he had obtained a title to the same by his deed, did not authorize a wrongdoer who had no title to enter upon the possession of his assignee and oust the latter therefrom. And if the defendants did not own the premises, they were wrongdoers in reference to the prior possession of Starr, although they supposed that by the legal construction of the deeds through which they claimed title, such deeds would cover the premises. The decision of the judge who tried the cause, was therefore erroneous, if the defendants did not succeed in showing a good paper title to the premises through the deed to Allen for 100 acres of land, as referred to and excepted in the conveyance from Gorham & Phelps to Hunt and others in 1790.

It was admitted upon the trial, that at the time of the conveyance to Hunt and others, Gorham & Phelps, the grantors, owned the premises which purported to be granted by that deed. And that they also had title to the 100 acres therein excepted, and referred to, as having been deeded to Allen, at the time of the conveyance to him. But I can see no principle upon which we can give a more extended construction to either of those conveyances, for the purpose of including that part of the alveus or bed of the Genesee river, than we have heretofore

given to a similar description of the river boundary in the deed to Cobb. If our decision in that case was wrong, it would be unjust to adhere to it now for the purpose of depriving these plaintiffs of their title to the premises in controversy under the last mentioned deed. On the other hand, if it is to be considered as settling the rule of construction as to the rights of riparian owners, in deeds containing the same or similar words of restriction in their river boundaries, the plaintiffs are entitled to the benefit of this rule of construction, in resisting the claim of the defendants as against the prior possessions of the premises by Cobb and Starr. The late chief justice, in his opinion in this case, admits there would be great difficulty, in taking the river boundary of the 20,100 acre tract, conveyed to Hunt and others, out of the decision of this court on the former occasion. And he places his decision upon the ground that the conveyance to Allen, referred to in the deed from Gorham & Phelps to Hunt and others, was susceptible of a more extended construction. But I think he erred in supposing that if the alveus or bed of the river was not included within the boundaries of the deed to Hunt and others, it could be included within the 100 acres of Allen, which is reserved and excepted out of their grant.

It must be recollected, that the supposed deed to Allen was not produced by the defendants, upon the trial; and that there was no evidence of its existence, other than this reservation or exception in the subsequent deed of 1790, to Hunt and others. Of course there was nothing beyond the language of the reservation itself to raise a presumption that the 100 acres of Allen was not restricted in its river boundary to the bank of the river, in the same manner as the 20,100 acre tract out of which that 100 acres was excepted and reserved. Indeed such a presumption would make the exception more extensive than the grant. But Lord Coke says an exception is always of a part of the thing granted. And in this case I think it would be doing violence to the language of the conveyance to Hunt and others, to suppose the whole of the 100 acres which had been previously conveyed to Allen, was not included with-

in the bounds of the 20,100 acre tract; in the same manner as if the conveyance to Allen had described that tract as it is described in the deed of 1790, and then had granted him 100 acres of that tract, to be laid out in a square form as near as the traverse of the river would admit, bounded on the east by the east line of that tract, to wit, the west bank of the river, and the north and south lines of the 100 acres to be equi-distant from the mill of Allen, which then stood on or near such east line. Here the language of the exception is not that the 100 acres was bounded by the river as a general boundary. And the reference to the traverse of the river, in the exception of the 100 acres, should have the same construction as it has in the operative words describing the boundaries of the grant itself; where a similar reference is made to the traverse of the river. There, it unquestionably means that the eastern boundary is to run along the bank or shore of the river, following its sinuosities, and not in a straight line upon the top of the bank between the two points where the north and south lines of the tract terminate upon the west bank of the river. And in the exception it means that the 100 acres should be laid out in a square form as near as it can be, having for its eastern boundary the east line of the 20,100 acre tract out of which it is excepted; which line, as before stated, is not to be straight, but is to run along the bank of the river, following the sinuosities of such river.

There was no evidence on the trial that Rochester, Fitzhugh and Carroll, or any persons claiming under them, ever had possession of any part of the *alveus* or bed of the river, at the place in question, or any where else, claiming the same under and through the deed referred to in the conveyance to Hunt and others, previous to the possessions of Cobb and Starr. On the contrary, it appears from the map which was given in evidence upon the trial, that Allen's mill stood some little distance back from the margin of the river, and that the water which supplied that mill while in the hands of Williamson, was taken from the river above the south line of the 100 acre lot. It is probable, therefore, that no person had ever erected a dam in the

bed of the river, opposite this 100 acre lot, as described in the reservation in the deed of 1790, previous to the deed to Cobb. No practical construction, therefore, had been given to Allen's deed, by Rochester, Fitzhugh and Carroll, or either of them, previous to the possession of Cobb, which could in any way affect the right of the plaintiffs in this case to recover, by virtue of the prior possession of Cobb and Starr.

For these reasons I think the judgment of the supreme court is erroneous and should be reversed.

Lott, Senator. The premises in question are part of the bed of the Genesee river. The plaintiffs have shown no paper title, but rely on a possession thereof admitted to have been commenced in the fall of the year 1819, by William Cobb, and to have been continued by him and the plaintiff Starr, to whom it was transmitted, from that time till the entry of the defendants. This possession is sufficient to entitle Starr to recover, unless the defendants have shown a better right. (*See cases cited in Cowen and Hill's Notes to Phil. Ev. note* 309, *pp.* 353, 354.)

It is claimed by the defendants that the premises are part of a tract, of one hundred acres, conveyed by deed to Ebenezer Allen. This deed was not introduced, nor is there any evidence of its existence or of what particular premises it purported to convey, except as contained in a conveyance from Gorham and Phelps to Ebenezer Hunt and others, dated the eighth day of November, 1790. It becomes necessary, therefore, to examine this conveyance with some particularity. It grants " a certain tract of land and water in the Western territory so called, it being *part* of the western territory lately ceded by the state of New-York to the commonwealth of Massachusetts, in township, No. 1 in the short range, so called, situate on the west side of the Genesee river (then) in the county of Ontario, (but now a part of Monroe county) containing twenty thousand one hundred acres," beginning at a marked " beech post standing on the bank of said river," and then, after running around three sides of the tract (designating each corner by a monument) " to a white oak tree " marked, &c. runs " *on the bank* of said river,

agreeably to the traverse, to the first mentioned bound;" and then follow these words "*reserving out of the above described land* one hundred acres, which is conveyed by deed to Ebenezer Allen, and is to be laid out in a square form as near as the traverse of the river will admit, and the said Allen's mills to be the centre of the eastern boundary." The habendum clause is not of the premises generally, but "to have and to hold the before granted twenty thousand acres of land with all the streams, water privileges and appurtenances whatsoever belonging," &c. It was conceded that Gorham & Phelps had title to the whole tract until the conveyance of the one hundred acres thereof to Allen and the residue to Hunt and others. Assuming then, that this is sufficient evidence of a grant of one hundred acres to Allen, the question to be considered is, whether it included the bed of the river. It is said by Mr. Angel in his work on water-courses, p. 6, "whatever the parties may intend, if the land is bounded 'by the river,' the grantee will hold to the middle of the river; and so, on the other hand if the grantee is bounded by visible and durable monuments, as 'a tree' or 'a fence,' near, but without the edge of the river, it is equally clear, that he can claim no interest in the bed or water of the river." Indeed, it has been decided and settled by this court in this very case, on the reversal of a former judgment therein, when the plaintiffs relied on a deed bounding the grantee "*along the shore of the river*" that it excluded the bed, although one of the lines ran "*to* the river." The learned judge, however, who has assigned the reasons of the supreme court for their judgment, now under review, while he concedes that "there would be great difficulty in taking the river boundary of the twenty thousand acre tract out of the doctrine as expounded by the learned judges" who delivered opinions in favor of that reversal, nevertheless insists and holds that the grant of the one hundred acres to Allen, "to be laid out in a square form as near as the traverse of the river will admit," was without restriction or particular reference to the bank or shore, and therefore, he says, carries with it the bed to the centre of the stream. In this, with due deference, I think he is mistaken.

The only description of this tract, as I have before stated, is in the deed from Gorham & Phelps, above referred to. That, it will be recollected, does not profess to run the boundary of either side *to the river*, but commencing at a "post standing on the bank of the river" and running thence from monument to monument specifically designated, runs the last line *"on the bank* of the river, agreeably to the traverse, to the first mentioned bound," then "reserving *out* of the above *described* land," the one hundred acres which *is* conveyed to Allen. The very form of the reservation precludes all possibility that the grant to Allen extended *beyond* the boundaries of the entire tract as described. It was reserved *out* of it, and unless it can be shown that a thing excepted is not included within the subject, *out* of which it is excepted, there does not appear to me to be any ground for the distinction taken by the court below. There are other circumstances, which may be referred to, which indicate that the grant to Allen did not extend beyond the eastern boundary of the large tract, and indeed there is room for doubt whether it even went up to it. I will briefly allude to some of them. The premises, as specifically described, contain twenty thousand and one hundred acres. The quantity conveyed to Hunt was twenty thousand acres, leaving therefore the precise balance of one hundred acres for Allen. Again: There is nothing to show that the conveyance to Allen had been made before the time of the execution of the deed to Hunt. Indeed the terms "which *is* conveyed by deed" and "is to be laid out in a square form," would rather favor a contrary presumption, and that it was a cotemporaneous act. They certainly preclude the idea of a location having been made; and when the context and the object of the reservation or exception are considered, it appears to me that no other conclusion can be drawn than that the one hundred acres were included within and were to be taken out of the larger tract, as particularly described.

Again. The terms "the said Allen's mills to be the centre of the eastern boundary," clearly, as I think, establish the fact that the bed of the river was not intended to be included. It is shown that this mill stood several rods from the river, but it

is assumed by Chief Justice Nelson in this case, as it was in the opinion referred to by him, of Judge Savage in *Jackson* v. *Smith*, that it was standing on the one hundred acre tract. Is there any foundation for this assumption? It certainly was not impossible for Allen to have acquired title to the lot on which the mill was built prior to the grant of the one hundred acres, nor is there any thing inconsistent with it. The very language of the reservation declares that the land excepted "is to be laid out." It contemplates future location, and the parties adopt "Allen's mills" as a point to control it. That was to be "the centre of the eastern boundary," an object by which the property intended to be laid out was to be bounded, and necessarily excluding the idea of its being a part of the premises granted. The terms and whole scope of the deed to Hunt fully justify the assumption that the description of the one hundred acre tract as given in the reservation or exception was the same as in the deed to Allen. If so, (and there is nothing appearing to the contrary,) the conclusion appears to me irresistible that the property granted to him did not extend beyond the mill. This construction is perfectly consistent with that part of the reservation which speaks of "the traverse of the river," in making the location. It was, it would seem, the wish of the parties to have the tract laid out in a square form. The windings of the river might, however, render that impracticable to a certain extent, without including some part thereof within the boundary. It was then, as if to guard against that consequence, provided that it should "be laid out in a square form *as near as the traverse of the river will admit.*" Instead, therefore, of affording a ground to impeach, I think it tends to confirm the construction given. Another circumstance, perhaps of not much importance, may be alluded to. It appears by the map purporting to be of the one hundred acre tract, annexed to the case, that it in fact contains upwards of one hundred and six acres, affording additional evidence that it did not extend to the river. If these views are correct, the defendants have failed to establish any title or right to the premises, through the several mesne conveyances from Allen relied on, and as no other

title or any right thereto was shown by them, the plaintiffs were improperly nonsuited. The judgment should therefore be reversed.

PORTER, Senator. Prior to the year 1819 the title to lot number 12 was in Nathaniel Rochester; and this lot extended east, as the defendant contends, to the thread of the Genesee river. In that year he conveyed different portions of the lot to Cobb and Morgan, which embraced the whole width of the lot on the west end. The eastern lines of those lots are described as running "along the shore of said river to Buffalo street." The question, whether these east lines run along the thread of the stream, and thus extended the lots east to that point, has been settled in this court. In the case of *Child* v. *Starr*, (4 *Hill*, 369,) a construction has been put upon the language of those deeds in this respect; and it must now be considered as the settled law of the case, that the rights of the grantees in those deeds are limited to the shore of the river.

This is admitted by the plaintiffs; and they do not seek to recover in this suit by virtue of any right acquired under those deeds; but they take the ground that the title of Rochester himself never extended any further east than the east lines of the lots he conveyed to Cobb and Morgan, or the shore of the river, and as they have proved a prior possession beyond those lines, under claim of title, they insist that that possession will entitle them to recover in this suit, because the defendants, as they claim, have no title whatever. Whether Rochester had title to the bed of the river, east of the premises conveyed to Cobb and Morgan, is therefore the question to be decided in this case.

In the deed of partition between Carroll, Fitzhugh and Rochester, this lot No. 12 is conveyed to Rochester, and is described as bounded "by the Genesee river on the east." This description will extend the title of Rochester to the middle of the stream, provided their joint title extended so far east; for all the authorities concur, that when the premises conveyed are described as bounded by a stream of water, the legal presumption is that the grantor intended to convey to the middle

of the stream. It becomes necessary, therefore, to ascertain whether Carroll, Fitzhugh and Rochester owned to the middle of the Genesee river; for Rochester succeeded to all their joint rights between the West bank and the middle of the river.

Phelps & Gorham, were the owners of a large tract of country lying upon both sides of the river; and they conveyed to one Allen one hundred acres lying on the west side of the river, which the defendant alleges embraced the premises in question. We have no particular description of the premises conveyed to Allen, nor is there any evidence of such a conveyance, except that contained in a reservation, to be found in a deed from Phelps & Gorham to Ebenezer Hunt and others, of a 20,100 acre tract " situate on the west side of the Genesee river;" and which embraced the one hundred acres before sold and conveyed to Allen. That reservation is in these words, " reserving out of the above described land one hundred acres, which is conveyed by deed to Ebenezer Allen, and to be laid out in a square form as near as the traverse of the river will admit; and the said Allen's mill to be the centre of the eastern boundary." It is clear that in locating this one hundred acres, we have no very certain land marks to direct us. It must, however, be on the river side of the tract, for on one side the line is to be regulated by the traverse of the river; that is, it is to follow its windings. And Allen at the time had a mill upon his hundred acres, which is a point well known, and the north and south lines were to be equally distant from that mill.

The counsel for the plaintiffs contends that as the eastern boundary of this larger tract is described as being " *on the bank* of the river," which description the authorities agree will exclude the bed of the river; and as the one hundred acres is excepted from the larger tract, the east line of the latter cannot be extended to the middle of the stream. If, as is contended, the one hundred acres must be taken from the larger tract, and that tract is limited to the bank of the river, it follows necessarily that the one hundred acres can extend no farther east. If we had the description contained in the deed of the one hundred acres before us, and that limited the east line to the *bank*

*of the river,* or to the eastern boundary of the larger tract, then it would be clear what the parties to that deed meant. But is it correct to infer and decide, that because the grantors in the deed to Hunt and others, contracted the eastern boundary to the bank of the river, therefore, they must have done the same in the deed to Allen? We have not Allen's deed in evidence, and why should his grantees be bound absolutely by the description in Hunt's deed. Allen's deed was first given, and possession taken under it, and improvements made; and I think we are required to look into the circumstances connected with the giving of that deed, while adjudicating upon the rights of those holding under it.

At the time that Allen bought of Phelps & Gorham, they owned the bed of the river, as well as the land on the margin; and it is sufficiently obvious, from the language of the reservation in Hunt's deed, that they intended to sell and convey to Allen, and that he intended to buy a site for a mill, to be propelled by the waters of that river. The land then at that time was wild and uncultivated, and as one object of Allen was to purchase a mill site, no presumption can reasonably be indulged, that the parties intended to limit the grant to the bank of the river. Indeed, the presumptions, I think, should be all the other way, while there is no particular description requiring a more limited construction. It should appear from the deed, that the parties intended to exclude the bed of the river from its operation, by the use of such terms in the description of the premises as have been held by the court, to confine the grant to the bank or shore, or the court should presume that the grant extended to the middle of the river. Otherwise one object of the purchase will be defeated. If Allen's title extended only to the bank of the river, he would fail to secure thereby the use of the water of the river for his mill. Hence, I think it is not enough to refer to the description contained in the conveyance of the larger tract, from which the one hundred acres were excepted, and insist upon applying that description to Allen's deed; but the plaintiffs should also show that Allen, by the terms of his deed, was confined to the bank of the river.

Again, it is contended by the counsel for the plaintiffs, that as the reservation of the hundred acres, in the deed to Hunt, says " that Allen's mill is to be the centre of the eastern boundary" of the hundred acres, the defendants must be bound by a line running north and south through that mill, until they show by the deed that the grant extended beyond it. This objection requires that a construction should be put upon the language used in that reservation. It must be confessed that the meaning is somewhat obscure. It directs that the hundred acres shall be " laid out in a square form, as near as the traverse of the river will admit;" that is, that its south, west and north lines shall be of the same length, making such allowances as may be necessary for the windings and turnings of the river, and that its east line shall be along the river. It seems to me that a fair interpretation of the words " traverse of the river," as used in this deed, and in the description of one of the courses, will well warrant the court in saying that the east line run along the course of the river. The idea that Allen's mill stood on the eastern boundary, because the reservation says that " Allen's mill is to be the centre of the eastern boundary," is repelled by the fact that the mill stood some distance from the shore, and the owner of the mill would thus be cut off from all connexion with the river. And also, because it is absurd to talk of a mill as being in the centre of a boundary line, unless you refer to the fact that it is equally distant from either end. And in that sense it has no bearing upon this question ; though I have no doubt that that was the sense in which it was used in this deed.

In my judgment the conveyance to Allen vested in him the title to the middle of the Genesee river; and if so, the case shows that the defendant now holds that title. I think the judgment should be affirmed.

BARLOW, JOHNSON and TALCOTT, Senators, delivered written opinions in favor of a reversal of the judgment of the supreme court, concurring in the views entertained by the chancellor.

Moses v. Mead.

SPENCER, Senator, delivered a written opinion in favor of affirmance.

On the question being put, " *Shall this judgment be re-versed?*" the members of the court voted as follows:

*For reversal:* The CHANCELLOR, and Senators BARLOW, BEERS, DENISTON, DEYO, JOHNSON, LOTT, SANFORD, J. B. SMITH, TALCOTT, WILLIAMS, WRIGHT—12.

*For affirmance:* Senators HARD, PORTER, PUTNAM, S. SMITH, SPENCER—5.

Judgment reversed, and *venire de novo* ordered.